IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERINATAL MEDICAL GROUP, INC., KRISHNAKUMAR RAJANI, M.D., and STEPHEN ELLIOT, M.D.,<br><br>Plaintiffs,<br><br>vs.<br><br>CHILDREN'S HOSPITAL CENTRAL CALIFORNIA, SPECIALTY MEDICAL GROUP CENTRAL CALIFORNIA, INC., and CENTRAL CALIFORNIA NEO-NATOLOGY GROUP,<br><br>Defendants. | CASE NO. CV F 09-1273 LJO GSA<br><br>**ORDER ON DEFENDANT'S MOTION TO DISMISS** (Doc. 41) |

**INTRODUCTION**

Defendant Central California Neonatology Group, Inc. ("CCNG") moves to dismiss two antitrust asserted by plaintiffs Perinatal Medical Group, Inc., ("PMG"), Krishnakumar Rajani, M.D. ("Dr. Rajani"), and Stephen Elliot, M.D. ("Dr. Elliot") (collectively "Plaintiffs"), pursuant to Fed. R. Civ. P. 12(b)(6). CCNG contends that because defendants cannot conspire with each other for antitrust purposes and have no duty to deal with Plaintiffs, Plaintiffs' 15 U.S.C. §1 ("Section 1") and 15 U.S.C. §2 ("Section 2") claims must be dismissed. In addition, CCNG argues that this Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(c). For the following reasons, this Court DENIES CCNG's motion to dismiss.

1

# BACKGROUND

## Factual Allegations[1]

Dr. Rajani and Dr. Elliot are neonatologists who have practiced neonatology in the Fresno area for 30 and 25 years, respectively. Dr. Rajani and Dr. Elliot are shareholders in PMG, a professional medical corporation that has provided services in and for various Fresno and Madera county hospitals since 1980. Dr. Rajani is the PMG President. Dr. Vinod Bansal, Dr. Chetan Patel, and Dr. Kajori Thusu ("former shareholders") were also PMG shareholders.

Until February 28, 2009, Dr. Rajani was the Medical Director of the Neonatal Intensive Care Unit ("NICU") at defendant Children's Hospital Central California ("Children's"). Children's is a non-profit corporation that serves pediatric patients from approximately 35 cities in a geographic area of approximately 45,000 square miles. Children's NICU has a "regional" designation, the highest of three designations under California law. Certain critically ill infants must be treated at a regional facility. Through February 2009, PMG had a contract with Children's to provide 24/7 coverage at, and administrative services for, Children's NICU. Through this contract, Plaintiffs maintained staff privileges at Children's.

Dr. Rajani and Dr. Elliot also enjoy privileges at Community Medical Center ("Community"), the local teaching hospital. In December 2008, Community, with the assistance of Drs. Rajani and Elliot, opened a new 65 bed NICU. Community's NICU does not have a "regional" designation. Critically ill infants with certain medical conditions, therefore, must be transferred from Community to Children's for treatment.

While Drs. Rajani and Elliot were assisting with the development of Community's NICU, Children's and defendant Specialty Medical Group Central California, Inc. ("SMG")[2] complained about two doctors. First, Children's disapproved of Dr. Rajani's referral of pediatric surgery cases to Dr.

---

[1] The facts from the amended complaint are taken as true. *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). Despite this well-settled rule, CCNG injects multiple "facts" outside of the amended complaint in its statement of facts and argument. The Court shall not consider facts outside of the complaint for this motion.

[2] SMG is a professional medical corporation of approximately 70 specialty physicians who practice medicine in the area. SMG and Children's have a contractual relationship in which SMG provides physician services and Children's provides facilities and patient support services.

David Hodge, who had left SMG to practice independently, because SMG doctors lost business when referrals were made to him. Children's asked Dr. Rajani to restrict his specialty referrals to physicians affiliated with the Hospital. Second, Children's criticized Dr. Virdina Meade for spending time at Community rather than Children's. Because Children's contributed funds toward recruiting this neonatologist to the area, the hospital believed it had a superior right to her services.

In addition to these complaints, Children's was concerned that Community was building a "flagship NICU" that would compete with Children's NICU. To address these concerns, Children's and CCNG conspired to close Children's NICU to neonatologists who were not affiliated with CCNG or SMG. Specifically, defendants conspired to exclude Plaintiffs from admitting or treating their patients at Children's.

According to the amended complaint, the conspiracy began in mid-2008. Children's approached PMG's former shareholders and promised to assist the former shareholders in the transition of their practices if they would leave PMG. In late 2008, Children's told Dr. Rajani that if PMG did not agree to practice exclusively through Children's, and in particular not at Community, then Children's would not renew PMG's contract. Children's demanded that PMG sign an amendment to their contract to prohibit the physicians from admitting or treating patients at competing hospitals. In addition, the contract amendment prohibits a physician from referring a patient to any specialist who is not a member of SMG. Plaintiffs refused to sign the amended contract. PMG's contract with Children's expired in February 2009. The former shareholders agreed to the amendment, and left PMG to form CCNG when PMG's contract with Children's expired. CCNG then entered into an exclusive contract with Children's to provide Medical Director and related services at Hospital's NICU. Under the terms of the agreement between CCNG and Children's, CCNG physicians make all specialty referrals to SMG physicians and practice exclusively at, and admit all of their patients to, Children's NICU.

After Children's terminated PMG's contract, beginning March 2009, Plaintiffs made numerous unsuccessful attempts to admit and care for patients in Children's NICU. Each time, notwithstanding Plaintiffs' privileges, Plaintiffs were told that they could not admit patients unless either they, or another physician, was present physically in Children's NICU during the entire hospital stay of each patient, 24 hours a day, 7 days a week. Children's Medical Executive Committee formalized this rule and

regulation on March 21, 2009 to require an admitting neonatologist, or a substitute, to provide 24/7 coverage for all patients admitted ("24/7 rule") .

Plaintiffs contend that the 24/7 rule presents a financial obstacle to them and forces them to relinquish care of their patients to CCNG, the group of neonatologists that "runs" Children's NICU. Plaintiffs maintain that the 24/7 rule effectively means that no neonatologist who is not a member of CCNG can admit patients to Children's NICU. The 24/7 rule further deprives patients of the right to choose a physician. In addition to the 24/7 rule, Children's continues to refuse to enter into a coverage contract with Plaintiffs. The 24/7 rule and Children's refusal to deal with PMG have caused Plaintiffs harm in the form of lost patients, revenue, and physician referral base.

## State Court Action

PMG initiated a state court action against its former shareholders on April 29, 2009 in the Fresno County Superior Court, Case No. 09 CE CG 01478 DSB ("state court action"). In the state court action, PMG alleges that the defendants "engaged in discussions and/or negotiations with [Children's], Kaiser, and other entities or individuals designed to divert business, assets and corporate opportunities of Plaintiff to Defendant for their personal benefit and profit."[3] In its first amended complaint, PMG asserts the following claims: (1) breach of fiduciary duty; (2) breach of "corporate provider agreements"; (3) breach of employment agreement; (4) intentional interference with economic advantage; and (5) negligent interference with economic advantage.

## Procedural History

Plaintiffs initiated this action on July 21, 2009. In the amended complaint, Plaintiffs assert eight causes of action defendants: (1) Violation of Sherman Antitrust Act §1; (2) Violation of Sherman Antitrust Act §2; (3) Intentional Inference with Economic Relation (Physician Contract); (4) Intentional Interference with Economic Relation (Kaiser Contract); (5) Intentional Interference with Economic Relation (Physician Referral Base); (6) Violation of Cartwright Act; (7) Interference with Right to Practice Profession; and (8) Unfair Competition.

---

[3] The Court takes judicial notice of the first amended complaint filed in the state court action and submitted as an exhibit to CCNG's motion.

CCNG moved to dismiss Plaintiffs' amended complaint on March 12, 2010.[4] Plaintiffs opposed the motion on March 29, 2010. CCNG replied on April 5, 2010. This Court found this motion suitable for a decision without oral argument, vacated the April 13, 2010 hearing pursuant to Local Rule 230(g), and issues the following order.

## DISCUSSION

### Motion to Dismiss Antitrust Claims

### Pleading And Fed. R. Civ. P. 12(b)(6) Motion Standards

A motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the pleadings set forth in the complaint. A Fed. R. Civ. P. 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations of the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588 (9th Cir. 2008).

To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility for entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

---

[4] SMG and Children's filed answers to Plaintiffs' amended complaint on March 12, 2010 and March 25, 2010 respectively.

5

*Twombly*, 550 U.S. 554,127 S. Ct. 1955, 1964-65 (internal citations omitted). Thus, "bare assertions...amounting to nothing more than a 'formulaic recitation of the elements'...are not entitled to an assumption of truth." *Iqbal*, 129 S. Ct. at 1951 (quoted in *Moss v. United States Secret Serv.*, 2009 U.S. App. LEXIS 15694, *14 (9th Cir. 2009)). A court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Farm Credit Services v. American State Bank*, 339 F.3d 765, 767 (8th Cir. 2003) (citation omitted).

Moreover, a court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562, 127 S.Ct. at 1969 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

To state an antitrust claim, "the need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'show that the pleader is entitled to relief.'" *Id*. at 1966. In *Twombly*, 127 S. Ct. 1955, 1966-67, the Court further ruled

> [I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive. As we indicated over 20 years ago...a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed (internal citations and quotations omitted).

With these standards in mind, this Court turns to the CCNG's challenges to Plaintiffs' antitrust claims.

### Sherman Act Antitrust Claims

The purpose the Sherman Act, 15 U.S.C. §1 et seq., "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 458 (1993). "The law directs itself not against the conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Id*. To protect the public from anti-competitive conduct, Section 1 of the Sherman Act prohibits "[e]very

contract, combination...or conspiracy in restraint of trade or commerce among the several States." 15 U.S.C. §1. Section 2 of the Sherman Act prohibits antitrust activity of a single entity to "monopolize, or attempt to monopolize, or combine or conspire with any other persons, to monopolize any part of the trade or commerce among the several states."

CCNG presents two arguments to support its motion to dismiss Plaintiffs' Sherman Act claims. First, CCNG argues that Plaintiffs' Section 1 claim fails because defendants are not "separate entities pursuing different economic goals, capable of conspiring for Sherman Act purposes." *Jack Russell Terrier Network v. Am. Kennel Club*, Inc., 407 F.3d 1027, 1035 (9th Cir. 2005).[5] In response, Plaintiffs maintain that the amended complaint contains sufficient allegations to support a conspiracy. Second, CCNG contends that under antitrust law, Children's has no duty to make its facilities available to Plaintiffs and antitrust law "is not concerned with the kind of injury that plaintiff PNG is claiming." To oppose this position, Plaintiffs cite California Welfare & Institutions Code section 14087.28 to argue that Children's has a duty to make available its facilities to Plaintiffs. Moreover, Plaintiffs maintain that the amended complaint sufficiently alleges a vertical agreement proscribed by the Sherman Act. The Court considers each argument below.

### *Conspiracy*

"Section 1, like the tango, requires multiplicity: A company cannot conspire with itself." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147 (9th Cir. 2005) (citing *Copperweld Co. v. Independence Tube Co.*, 467 U.S. 752, 769 (1984)). In *Copperweld*, the United States Supreme Court ruled that a parent corporation and its wholly-owned subsidiary are incapable of conspiring for antitrust purposes because the two entities are not "separate economic actors pursuing separate economic interests." 467 U.S. at 768. Since *Copperweld*, the "single-entity" rule has been extended beyond the parent corporation and wholly-owned subsidiary context. *Freeman*, 322 F.3d at 1147-48. In considering whether the defendants are a "single entity" or capable of conspiring for Section 1 purposes, the "crucial

---

[5] Additionally, CCNG argues that because Plaintiffs' Section 2 claim alleges a conspiracy rather than a unilateral action, the Section 2 claim necessarily fails. This Court previously rejected this argument in its Order on Children's Motion to Dismiss (Doc. 19), explaining that although the Sherman Act contains a "basic distinction between concerted and independent action," *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761 (1984), Section 2 prohibits a single entity from combining or conspiring with other entities. "By making a conspiracy to monopolize unlawful, §2 does reach both concerted and unilateral behavior." *Copperweld*, 467 U.S. at 768 n. 13. Accordingly, CCNG's argument is incorrect.

question" is "whether the entities alleged to have conspired maintain an 'economic unity,' and whether the entities were either actual or potential competitors." *Jack Russell Terrier Network*, 407 F.3d at 1034. CCNG argues that the "provision of the neonatal unit and the provision of physician services are complementary, not competitive." Therefore, CCNG concludes that Plaintiffs do not satisfy the pleading requirements to state an antitrust claim for conspiracy.

Physicians, including members of an independent practice association, are independent entities who can conspire with each other and others for antitrust purposes. *Capital Imaging Assoc. v. Mokawk Valley Med. Assocs.*, 996 F.2d 537, 544 (2d Cir.), *cert. denied*, 510 U.S. 947 (1993) (member physicians of an independent practice association are legally capable of conspiring among themselves); *Nanavati v. Burdette Tomlin Mem'l Hosp.*, 857 F.2d 96 (3rd Cir. 1988), *cert. denied*, 489 U.S. 1078 (1989); *Bolt v. Halifax Hosp. Med. Ctr.*, 891 F.2d 810, 819 (11th Cir.), *cert. denied*, 495 U.S. 924 (1990), *vacated, in part, remanded*, 980 F.2d 1381, *reh'g en banc denied*, 988 F.2d 1220 (11th Cir. 1993) ("*Bolt*") ("Each member practices medicine in his individual capacity; each is a separate economic entity potentially in competition with other physicians."). Accordingly, CCNG can conspire legally within the group and with co-defendant SMG to satisfy Plaintiffs' Section 1 claim.

Whether physicians and a hospital can conspire for antitrust purposes is an unresolved question among the circuits. Some courts have ruled that medical staff members cannot conspire with a hospital. *Weiss v. York Hosp.*, 745 F.2d 786 (3rd Cir. 1984), *cert. denied*, 470 U.S. 1060 (1985) (medical staff empowered to make decisions regarding staff privileges "operated as an officer of a corporation would in relation to the corporation. Although the members of the medical staff had independent economic interests in competition with each other, the staff as an entity had no interest in competition with the hospital."); *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696 (4th Cir. 1991), *cert. denied*, 502 U.S. 1074 (1992) (hospital and medical staff enjoyed "unity of interest" in peer review process and, thus, unable to conspire). Others have concluded that "a hospital and the members of its medical staff are all legally capable of conspiring with one another." *Bolt*, 891 F.2d at 819; *Boczar v. Mantee Hosps. & Health Sys., Inc.*, 993 F.2d 1514, 1517-18, *reh'g denied*, 11 F.3d 169 (11th Cir. 1993) (hospital capable of conspiring with physicians to boycott a physician).

Based on the law and allegations of the amended complaint, this Court rejects CCNG's position

that it is unable to conspire with Children's as a matter of law. Whether a hospital and a group of physicians have divergent economic interests to allow a conspiracy is a question of fact. *Bhan v. NME Hospitals, Inc.*, 669 F. Supp. 998, 1016 (E.D. Cal. 1987), *aff'd*, 929 F.2d 1404 (9th Cir. 1991), *cert. denied*, 502 U.S. 994 (1991); *Boczar*, 993 F.2d at 1518. Plaintiffs allege that CCNG and Children's have different economic interests; namely, the Hospital's interest is to protect the market share of its regional NICU, whereas CCNG's interest is to benefit from restricted specialty neonatology. In addition, and significantly, CCNG is an independent organization that contracts its services to Children's. The facts distinguish this matter from cases in which the physicians are members of a hospital's medical staff "operating as an officer of a corporation would in relation to the corporation." *Weiss*, 745 F.2d 786. Where, as here, "at least some participants in the alleged conspiracy may have had economic interests that were different from the Hospital" and the physician group "were not employees or officers of the hospital but rather independent contractors," then the Court draws the inference in favor of the non-moving party that the defendants "may have had an independent personal stake in any decision by the Hospital." *Bhan*, 669 F.Supp. at 1016-17. Under these circumstances, this Court cannot decide, as a matter of law, that defendants are incapable of forming a contract, combination, or conspiracy for Section 1 purposes. *Id*. Accordingly, CCNG's motion to dismiss is denied on these grounds.

*Antitrust Injury*

Next, the Court determines whether antitrust law prohibits the type of activity alleged in Plaintiffs' amended complaint. Although Section 1 and Section 2 of the Sherman Act differ, both sections require allegations of anti-competitive activity to state a claim. 15 U.S.C. §15; *see also, Business Electronics v. Sharp Electronics Corp.,* 485 U.S. 717, 723 (1988) (Section 1); *Pac Bell Tel. Co. v. Linkline Communs., Inc.*, 129 S.Ct. 1109, 1115 (2009) ("*Linkline*") (Section 2). Thus, if Plaintiffs' fails to allege a "restraint of trade," Plaintiffs' fail to state Sherman Act claims.

Plaintiffs allege that from approximately mid-2008 through the present, Children's, SMG, and CCNG have combined, conspired, and agreed to retrain trade by prohibiting neonatologists who will not agree to practice exclusively at Children's and who will not agree to make all specialty referrals exclusively to SMG physicians from practicing neonatology in the region. To further the conspiracy, defendants have: (1) unlawfully required, as a condition of renewal of PMG's contract with Children's,

9

that PMG's physicians agree to refer patients to SMG for specialist services; (2) unlawfully required, as a condition of contract renewal, that PMG physicians practice exclusively at Children's; (3) induced the former shareholders of PMG to form CCNG; (4) granted CCNG an exclusive NICU contract under which CCNG agreed to work exclusively at Children's and refer patients exclusively to SMG physicians; and (5) attempted to prevent, and did prevent, non-CCNG physicians from admitting patients to, and treating patients in, Children's NICU unless they agreed to the 24/7 rule.

Plaintiffs contend that the alleged conspiracy between the defendants has harmed competition in a number of ways. According to Plaintiffs, other physicians and health plans in the region , including Kaiser Permanente, that would otherwise refer patients to non-CCNG physicians, are now reluctant to refer their patients to non-CCNG physicians given the possibility that such patients may require services that can be provided only at Children's regional NICU. In addition, the ability of non-CCNG and non-SMG physicians to practice their profession has been limited unlawfully and their ability to provide services in the relevant market has been restrained. As a further consequence, certain critically ill infants have been deprived of the advantage of free and open competition in the purchase of physician services. Moreover, both patients and referring physicians in the region have been deprived of the right to a choice of physician providers. Plaintiffs allege that defendants' conspiracy has negatively impacted competition regarding the price and quality of physician services in the region.

CCNG relies on *Four Corners Nephrology Assocs. v. Mercy Medical Center of Durango*, 582 F.3d 1216 (10th Cir. 2009) ("*Four Corners*") to argue that a hospital's refusal to share its facilities with a doctor is insufficient to sustain a Section 1 or Section 2 claim. In *Four Corners*, the United States Court of Appeals for the Tenth Circuit ruled that a hospital's refusal to deal with a physician who ran a competing nephrology clinic "does not constitute anticompetitive conduct within the meaning of *Section 2* of the Sherman Act. 582 F.3d at 1221 (emphasis in original). The *Four Corners* court based its conclusion on the well-settled rule that the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919); *Linkline*, 129 S.Ct. at 1115 (2009) (A business has "no antitrust duty to deal with its rivals at all"). As the United States Supreme Court explained in *Verizon Communs., Inc. v. Law Offices*

*of Curtis v. Trinko*, LLP, 540 U.S. 398, 407 (2004) ("*Trinko*"):

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices--at least for a short period--is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct.

In rejecting claims that a refusal to deal runs afoul of antitrust law, the *Trinko* court explained that a competitor's right to deal freely promotes innovation while protecting against true antitrust activity such as collusion. *Trinko*, 540 U.S. at 407-08.[6]

Plaintiffs' reliance on California Welfare and Institutions Code section 14087.28 to oppose CCNG's argument is unavailing. A state law or regulation that imposes a duty on Children's is inapposite to a court's analysis of Sherman Act claims. For example, although a regulation required a party to deal with a competitor in *Trinko*, the Court ruled that the party had no duty to deal with the competitor under the Sherman Act. 129 S.Ct. at 1119. The Court reasoned that "any such duty [to deal] arises only from FCC regulations, not from the Sherman Act." 129 S.Ct. at 1119. Thus, a duty to deal arising from state law does not establish a duty to deal for antitrust purposes.

Similarly, the Court finds CCNG's reliance on *Four Corners* misplaced, as the non-binding decision is distinguishable on both factual and legal grounds. Factually, the parties in *Four Corners* were direct competitors. The physician, who operated a private nephrology clinic, sought to require the hospital to share its newly-built nephrology clinic facilities with him. Based on this fact, the *Four Corners* court ruled that the hospital "was entitled to recoup its investment [in the competing nephrology clinic] without sharing its facilities with a competitor." 582 F.3d at 1223. In addition, the court found that requiring the hospital to share its facilities with a direct competitor would threaten competition, rather than promote it. *Id*. Here, Plaintiffs do not allege that they are direct competitors with Children's or its NICU. Because Plaintiffs and Children's are not competitors, the refusal to deal doctrine–upon

---

[6] A competitor's right to refuse to deal with a competitor is not without limits. "The high value that [the Supreme Court has] placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*., 472 U.S. 585, 601, 86 L. Ed. 2d 467, 105 S. Ct. 2847 (1985). *Aspen Skiing*, the exception to this century-old rule, "is at or near the outer boundary" of Sherman Act liability. *Trinko*, 540 U.S. at 409.

which the *Four Corners* ruling was based–is inapplicable.[7]

The procedural posture of this matter provides a further distinction. The Tenth Circuit decided *Four Corners* on a fully-developed record, and based its decision on the evidence or lack thereof. Development of the record is important, because each element of each Sherman Act claim presents a question of fact. "Ordinarily, whether particular concerted action violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason–that is, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977). Similarly, the offense of monopoly has two factual elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). CCNG leaves unaddressed the elements of the Sherman Act claims in this motion.

Having considered the applicable standards and allegations, this Court finds that Plaintiffs' amended complaint sufficiently and plausibly alleges its Sherman Act claims. Plaintiffs allege that defendants have entered into a vertical agreement that, when considered with inferences drawn in favor of Plaintiffs, is proscribed by the Sherman Act. Under certain factual circumstances, an exclusive contract between a hospital and specialty group of physicians, that requires every patient treated at the hospital to use the services of that firm of physicians, may violate Section 1 of the Sherman Act. *Jefferson Parish Hospital Dist. No. 2 v Hyde,* 466 U.S. 2 (1984) (superseded by statute as stated in *Texas Instruments, Inc. v Hyundai Elecs. Indus.*, 49 F Supp 2d 893 (E.D. Tex 1999)); *see also*, *Bhan*, 669 F. Supp. at 1016. In addition, group boycotts of individual physicians are against antitrust doctrine. *Jefferson Parish,* 466 U.S. 2.; *United States v. Columbia Steel Co.*, 334 U.S. 495, 522-23 (1948).

---

[7] Antitrust law requires a court to consider the specific industry and regulatory framework, if any, to consider whether a party's actions harm competition. *Trinko,* 540 U.S. at 412-13. Thus, the Tenth Circuit's direct application of business cases to a health care industry dispute is questionable without further analysis:

> The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas.

*Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788 n.17, *reh'g denied*, 423 U.S. 886 (1975).

1 Finally, certain restrictive rules incorporated in a hospital's bylaws may also violate the Sherman Act.
2 *Quinn v Kent General Hospital, Inc*., 673 F Supp 1367 (D.C. Del. 1987) (physician states a claim in
3 antitrust action challenging nonprofit hospital bylaw that required active staff members with privileges
4 to admit patients must reside within 12 miles of hospital). Because Plaintiffs' amended complaint
5 contains allegations which plausibly state a claim for Section 1 and Section 2of the Sherman Act,
6 CCNG's motion to dismiss is denied.

### Motion to Decline Supplemental Jurisdiction Over State Law Claims

8 CCNG argues that this Court should decline to exercise supplemental jurisdiction over the state
9 law claims in this action. Pursuant to 28 U.S.C. §1367(c), "district courts may decline to exercise
10 supplemental jurisdiction over a claim...if ...(2) the claim substantially predominates over the claim or
11 claims over which the district court has original jurisdiction, (3) the district court has dismissed all
12 claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other
13 compelling reasons for declining jurisdiction." Supplemental jurisdiction is a "doctrine of discretion,
14 not of plaintiff's right[.]" *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 172 (1997)
15 (internal quotations omitted). "Congress intended the exercise of discretion to be triggered by the
16 court's identification of a factual predicate that corresponds to one of the section 1367(c) categories.
17 Once the factual predicate identified, the exercise of discretion, of course, is still informed by whether
18 remanding the pendent state claims comports with the underlying objective of 'most sensibly
19 accommadat[ing] the values of economy, convenience, fairness, and comity." *Executive Software No.*
20 *America, Inc. v. United States Dist. Ct.*, 24 F.3d 1545, 1557 (9th Cir. 1994) (overruled on other grounds
21 in *Cal. Dept. of Water Resources v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008)). The "ultimate
22 inquiry for the courts [is] whether the assertion of pendent jurisdiction is best accommodate[s] the values
23 of economy, convenience, fairness, and comity." *Id*. at 1556.

24 None of the 28 U.S.C. §1367(c) factors justifies a decline of supplemental jurisdiction over the
25 state law claims. This Court does not agree with CCNG's characterization that Plaintiffs' Sherman Act
26 claims are merely the "tail of the dog" in this action. The federal and state law claims arise out of the
27 same underlying facts, and the claims are closely tied. As the allegations focus on the defendants'
28 alleged anti-competitive activities, the state law claims do not "predominate" this action. Thus, this

Court will not decline supplemental jurisdiction pursuant to 28 U.S.C. §1367(c)(2). As set forth above, this Court does not grant CCNG's motion to dismiss the federal claims from this action. Accordingly, 28 U.S.C. §1367(c)(3) is inapplicable. Finally, this Court is not persuaded that "compelling reasons" and "exceptional circumstances" exist to decline supplemental jurisdiction pursuant to 28 U.S.C. §1367(c)(4). Generally, a related state court action that cannot be removed would justify a decline of supplemental jurisdiction based on the principles of comity and fairness. However, defendants point out that the state court action is based on distinct facts and legal claims. Whereas Plaintiffs' challenge the defendants' alleged antitrust activities in this federal action, they challenge the former shareholders' decision to break away from PMG in the state court action. In addition, the state court action is against one of three defendants. Even if this Court dismissed the state law claims against CCNG, those claims–which are based on the same allegations as the federal claims and involve CCNG–would continue in the federal action against the other two defendants. Based on these considerations, dismissal of the state law claims against one defendant would not promote judicial economy, convenience, fairness, and comity. Accordingly, this Court denies CCNG's motion to decline the exercise of supplemental jurisdiction over Plaintiffs' state law claims as to CCNG.

## CONCLUSION AND ORDER

For the foregoing reasons, this Court DENIES CCNG's motion to dismiss.

IT IS SO ORDERED.

**Dated:   April 14, 2010**                    **/s/ Lawrence J. O'Neill**
                                                                    UNITED STATES DISTRICT JUDGE